**IKEA US, INC., Plaintiff,**

v.

**U.S. DEPARTMENT OF JUSTICE IMMIGRATION AND NATURALIZATION SERVICE, Defendant.**

Civil Action No. 98–0719 (JR).

United States District Court,
District of Columbia.

March 24, 1999.

Lawrence H. Rudnick, Steel, Rudnick & Ruben, Philadelphia, PA, Thomas A. Elliot, Elliot & Mayock, Washington, DC, for plaintiff.

Brian J. Sonfield, Assistant U.S. Attorney, Washington, DC, for defendant.

## *MEMORANDUM*

ROBERTSON, District Judge.

Plaintiff, IKEA U.S., Inc. ("IKEA–US"), challenges the refusal of the Immigration and Naturalization Service ("INS") to reconsider its denial of a preference-visa application made on behalf of an IKEA employee, Jorn P. Mathiasen. The dispute centers on the INS' determination that Mathiasen's duties as the manager of a restaurant within one of IKEA–US's furniture stores were not "primarily managerial" within the meaning of the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1101(a)(44)(A). Now under consideration are cross-motions for summary judgment. For the reasons stated below, the defendant's motion will be granted, and the plaintiff's motion, denied.

### *Background*

The facts as set forth in the administrative record are undisputed. IKEA is a retailer of Scandinavian furniture and furnishings with more than 125 stores worldwide. A.R. 76. In 1994, IKEA planned to open a thirteenth United States store near Seattle, Washington. A.R. 88. The Se-

attle store, like every IKEA store, was to have a "large cafeteria style facility which serves Swedish specialties, especially Swedish meatballs." *Id.* While such restaurants "may account for as little as 5% of the sales within a given store," they play a "critical" role in attracting and keeping customers. A.R. 73. In order to ensure the successful start-up of the Seattle store's restaurant, IKEA–US petitioned the INS to issue an L–1 nonimmigrant visa to Mathiasen, a Danish chef who had worked for IKEA–Canada since 1983 and had helped open eighteen restaurants throughout Canada and the United States. A.R. 48–49 (Chuck Gruden letter to INS, dated Jul. 6, 1994). That application was approved on July 18, 1994, and Mathiasen was admitted into the United States on an L–1 visa valid until July 15, 1997. A.R. 91.

On January 26, 1995, IKEA–US filed a Form I–140 visa petition with the INS' Nebraska Regional Service Center ("Nebraska Service Center"), on behalf of Mathiasen, for a "first preference" employment-based immigrant visa, pursuant to 8 U.S.C. § 1153(b)(1)(C) ("preference visa"). A.R. 84–87. The application included a copy of the notice of approval of Mathiasen's L–1 visa, A.R. 86 & 91, but apparently did not include a copy of the initial L–1 visa petition and supporting documentation. A.R. 64–65.

The Nebraska Service Center requested more information in support of the application. Specifically, the Nebraska Service Center asked IKEA–US to detail Mathiasen's "day to day" managerial duties, explain what "results" Mathiasen reported to his superiors and how he "ensures that IKEA's high standards are met." A.R. 124. The Center also asked IKEA–US to specify how Mathiasen's assistant manager helped with the day to day management and to provide the job titles and duties of Mathiasen's 21 restaurant co-workers. *Id.*

After receiving IKEA–US's response, *see* A.R. 126–165, the Nebraska Service Center denied the application on December 1, 1995. A.R. 83.

Plaintiff appealed the defendant's initial decision, rendered by the INS's Nebraska Service Center, to the INS's Administrative Appeals Unit ("AAU").

On August 5, 1997, the AAU affirmed the Nebraska Service Center's denial. When the INS refused to reopen the case upon IKEA–US's appeal, IKEA–US filed this lawsuit on March 23, 1998. IKEA–US's complaint alleges that INS's decision was arbitrary and capricious within the meaning of the Administrative Procedures Act ("APA").[1] Complaint at 3 ¶ 12.

*Analysis*

The INS's determination that Mathiasen's duties are "primarily those of a supervisory food service worker" rather than those of a "manager" is subject to limited review. *See Republic of Transkei v. INS*, 923 F.2d 175, 176–77 (D.C.Cir. 1991) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)); *Richards v. INS*, 554 F.2d 1173, 1177 (D.C.Cir. 1977). This Court may not substitute its judgment for that of the INS. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Rather, this Court must examine the record to ensure that the INS' decision "was based on a consideration of the relevant factors and that the decision was not a clear error." *Transkei*, 923 F.2d at 177 (internal quotations omitted).

Applying this standard, it is clear that the INS' decision was "based on a consideration of the relevant factors" and did not constitute a "clear error of judgment." *Id.*

---

1. The complaint also alleges, at 3 ¶ 13, that the INS' rejection of the preference visa application was inconsistent with the previous grant of the L–1 temporary visa although

IKEA–US does not argue that INS is bound by its prior grant of L–1 status to Mathiasen. Pl.'s Response at 17.

*The statute*

Each year, the INS may grant a limited number of preference visas to "certain multinational executives and managers" who will serve "in a capacity that is managerial or executive." 8 U.S.C. § 1153(b)(1)(C).[2] "Managerial capacity" is defined to mean:

[A]n assignment within an organization in which the employee *primarily —*

(i) *manages the organization, or a department, subdivision, function, or component of the organization;*

(ii) supervises and controls the work of other supervisory, professional, or managerial employees, or manages an essential function within the organization, or a department or subdivision of the organization;

(iii) if another employee or other employees are directly supervised, has the authority to hire and fire or recommend those as well as other personnel actions (such as promotion and leave authorization) or, if no other employee is directly supervised, functions at a senior level within the organizational hierarchy or with respect to the function managed; *and*

(iv) exercises discretion over the day-to-day operations of the activity or function for which the employee has authority.

A first-line supervisor is not considered to be acting in a managerial capacity merely by virtue of the supervisor's supervisory duties unless the employees supervised are professional.

8 U.S.C. § 1101(a)(44)(A) (emphasis added). *See also,* 8 C.F.R. § 204.5(j)(2). This four-part definition, promulgated in the Immigration Act of 1990, Pub.L. No. 101–649, 104 Stat. 4978 (effective Oct. 1, 1991)

("1990 Act" or "IMMACT 90"), eased L–1 eligibility (and, by analogy, preference visa eligibility)[3] by adding the category of "functional manager." *See* 2 Charles Gordon et. al., *Immigration Law and Procedure,* § 24.05[2] at 24–26 to 24–27 (1998); Pl.'s Response at 13; A.R. 5 ("IMMACT 90 added the 'functional manager' concept."). Before the 1990 Act, the only way to qualify as a "manager" was by managing other managers. *See, e.g., Republic of Transkei v. INS,* 923 F.2d 175 (D.C.Cir. 1991).

*"Activity" manager*

■ Although IKEA's central contention is that Mathiasen is a "functional manager," it appears to suggest as well that Mathiasen qualified as an "activity" manager (*i.e.,* that he managed "the organization, or a department, subdivision, . . . or component of the organization)." 8 U.S.C. § 1101(a)(44)(A)(i).

Whether Mathiasen is an "activity" manager turns on whether he has sustained his burden of proving that his duties are "primarily" managerial. 8 U.S.C. § 1361. *See Republic of Transkei, supra; National Hand Tool Corp. v. Pasquarell,* 889 F.2d 1472, 1476 n. 5 (5th Cir.1989).

Here, as in *Transkei,* 923 F.2d at 177, the application "failed to document what *proportion* of [Mathiasen's] duties would be managerial/executive functions and what proportion would be non-manager/non-executive." *Id.* (emphasis added). IKEA lists Mathiasen' s duties as restaurant manager, A.R. at 128–130, but it fails to quantify the time he spends on them. This failure of documentation is important because several of Mathiasen's daily tasks—"ordering food products, menu planning and recipe creation"—do not fall directly under traditional managerial

---

2. Plaintiff does not claim that Mathiasen qualifies as an "executive". *See* Def. Mot. for Summ. J. at 8 n. 3; Pl.'s Response to Def.'s Mot. for Summ. J. at 14–16 (addressing only the issue of Mathiasen's status as a "manager").

3. *See* 1 Bill Ong Hing, *Handling Immigration Cases,* § 5.2 at 182 (2d ed., 1995) ("The 1C category for multinational executives and managers is analogous to the nonimmigrant intracompany transferee category.").

duties. A.R. 78. IKEA's assertion that "[c]learly, more than 50 percent of his time is spent on management functions," A.R. 40, is argument, not documentation. Its reliance on "common sense" for the proposition that Mathiasen's service duties should not disqualify him as an activity manager, A.R. 78, does not overcome the INS' conclusion that:

[T]he petitioner's evidence does not demonstrate that the beneficiary will be managing a subordinate staff of professional, managerial or supervisory personnel who will relieve him from performing the services of the restaurant.

A.R. 83.

*"Essential function"*

██ IKEA's main contention is that "Mr. Mathiasen's employment as a Restaurant Manager constitutes a 'functional manager' which definition was added as part of the definition of managerial capacity by IMMACT 90." A.R. 9. IKEA appears to be correct that no court in this Circuit has decided a case brought under the "functional manager" category. A.R. 9.

The Court assumes without deciding that managing the service of Swedish food in the IKEA organization, or within a department or subdivision of that organization, is an "essential function." 8 U.S.C. § 1101(a)(44)(A)(ii). That assumption does not answer the question, essential to what? The INS found the record "not persuasive in establishing that 'managing food service in one IKEA store is managing an essential function, department, subdivision or component *of the organization*,'" A.R. 83 (emphasis added), evidently taking the view that a function essential to one store is not an "essential function within the organization, or a department or subdivision of the organization." 8 U.S.C. § 1101(a)(44)(A)(ii).

That view reflects the INS' interpretation of an ambiguity within the statutory definition. If that ambiguity were critical to the resolution of the issue before the Court, the INS interpretation, which appears reasonable, would be accorded deference. *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). It is not necessary to invoke the *Chevron* doctrine, however, or to examine more closely examine INS' view of the place the Seattle store occupies within IKEA's organizational hierarchy, because the subdivision of the definition under which plaintiff makes its "essential function" argument, (A)(ii), is modified by the word "primarily," just as is the "activities manager" subdivision, (A)(i). Thus, even when claiming under the "essential function" definition, it was plaintiff's burden to document Mathiasen's duties. The inquiry comes out at the same place as the analysis of Mathiasen's status as "activity" manager.

*Failure to explain previous grant of L–1 visa.*

IKEA's reliance on *Omni Packaging, Inc. v. U.S. I.N.S.,* 733 F.Supp. 500, 504 (D.Puerto Rico 1990) (remanding denial of preference visa where INS did not "specifically elucidate" why previous grant of L–1 visa was erroneous) requires attention. The argument is that IKEA's "L–1 petition was approved on the same facts as presented in the I–140 immigrant petition," A.R. 70, and that the INS had a duty to explain the inconsistency between its grant of the L–1 visa and its denial of the preference visa. The problem with this argument is that IKEA did not timely submit Mathiasen's nonimmigrant file to the INS for its review in consideration of the preference visa. A.R. 64–65. *See also* A.R. 124 (notifying IKEA that INS would not consider evidence submitted after November 13, 1995). The inclusion of the L–1 application in the February 5, 1997 Motion to Reopen/Reconsider, A.R. 45–47, was too late, and does not compel this Court's further review of the INS' decision.